OTTO R. SEDA ET AL., MARÍA ISABEL NEGRONI DE VÉLEZ ET AL., and TARTAK BROTHERS, INC., Plaintiffs and Appellees and the latter also Appellant, *v.* MIRANDA HNOS. & CO., S. EN C., Defendant and Appellant.

Nos. 12,642    Decided May 13, 1963.
12,867
AP-62-25.

*L. E. Dubón, Luis E. Dubón, Jr., A. Torres Braschi,* and *R. Ruiz Sánchez* for appellant. *Héctor González Blanes* for some of the appellees and of Tartak Brothers, Inc. *Héctor Ramos Mimoso* and *Benjamín Rodríguez Ramón* for some of the appellees.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

PER CURIAM: Miranda Hnos. & Co., *S. en C.,* operates a factory in a building located on Ponce de León Avenue. The factory requires the use of a boiler. The smoke and the fumes emitted by the fuel used in the boiler are expelled through a chimney. A taller building owned by Tartak Brothers, Inc., is located next to the Miranda Hnos. building. Tartak had leased the sixth and seventh floors of the building to the Public Welfare Division of the Department of Health.

On March 11, 1955 Tartak Brothers, Inc., filed a complaint against Miranda Hnos. to recover the damages caused by the smoke, soot and gases expelled by the chimney. It alleged that it sustained damages in the amount of $60,000. Subsequently, on May 22, the complaint was amended in order to claim the additional sum of $15,180 corresponding to monthly rents which it failed to receive as a result of the fact that the sixth and seventh floors were vacated because of the corrosive and injurious gases expelled by the chimney. It is well to state that on October 5, 1954 Tartak had petitioned for "a permanent writ of injunction enjoining defendant to continue using the chimney standing on the building belonging to defendant situated at 1256 Ponce de León Avenue, and to cease to emit smoke, soot and gases expelled through the chimney." The hearing of this case was held on November 15, 18 and 29, 1954. On October 22, 1958 we affirmed the judgment rendered and issued the injunction. *Tartak Bros.* v. *Miranda Hnos. & Co.,* 80 P.R.R. 754 (1958).

On March 14, 1955 a group of 33 employees of the Public Welfare Division brought an action claiming the damages sustained by having inhaled and being exposed to the smoke, soot and other corrosive and poisonous gases expelled by the chimney. They claimed $165,000 damages.

On April 1, 1955 another group of 14 employees of that Division filed another complaint. They alleged that "the gases expelled by defendant's chimney contaminated the atmosphere in such a way that as of November 1952, when the offices where plaintiffs worked were installed in the building [of defendant], they have caused and are causing to plaintiffs damages consisting in poisoning, failing health, irritation of the conjunctiva and of the respiratory tract, stomach disorders, nausea, vomiting, diarrhea and other ailments produced by intoxication by inhalation of gases." This group claimed $84,000.

The three complaints were consolidated for joint hearing in the trial court. The complaint brought by Tartak was sustained awarding it compensation for $27,613 plus $3,000 fees. One of the items of damages claimed was dismissed, that for damages sustained by the furniture and merchandise. The other two complaints were sustained, but compensation to five of the plaintiffs was disallowed. Compensation for $7,900 plus $6,000 for attorney's fees was awarded to the first group; to the second group, $11,600 plus $3,000 fees. Defendant appealed to this Court from the judgments rendered against it. Tartak from that part which denied to it the right to claim one item of damages. We will consider in this opinion all the appeals taken.

Defendant assigns four errors: (1) It alleges that the trial court erred in weighing the evidence; (2) It alleges that one of the items of damages awarded to Tartak is improper, since the same were not claimed in the former injunction suit. It invokes our opinion in *Cruz* v. *Ortiz*, 82 P.R.R. 802 (1961); (3) It contends, in connection with Tartak's claim

for rents which it failed to receive, that it has prescribed, and if it has not, the allowance was greater than the amount established by the evidence; (4) Lastly, it contends that the attorney's fees awarded are excessive; (5) In the appeal taken by Tartak it is alleged that the determination of the trial judge denying compensation for damages to the furniture and merchandise existing in the store was erroneous.

■ 1. Let us consider the first error assigned. The evidence presented establishes unquestionably that the Public Welfare employees, plaintiffs herein, sustained the damages claimed. However, defendant maintains that it having been scientifically established as well as by a toxicologist that in order that the poisonous gas expelled by the chimney, identified as sulfurous anhydride or sulfur dioxide, to cause the disorders allegedly suffered by claimants, it was necessary that there be a concentration in the atmosphere of more than 10 p.p.m.,[1] and that since the highest of the tests made showed a concentration of 5.4 p.p.m., it was necessary to conclude that the damages suffered were not caused by the gases expelled by the chimney.

■ In considering this same issue, the trial judge held that "no matter how respectable and trustworthy the testimonies of the learned Drs. Machle, Colón, Ramírez Torres and other defendant's experts, they were not sufficient to defeat the reality of the physical and moral suffering experienced by plaintiffs." And the fact is that, as in all cases, in this case of organic disorders which may be caused by the concentration of poisonous gases in the atmosphere, inflexible measures, steadfast rules, cannot be established. In Vol. 69, No. 8, of August 1954 of the Public Health Reports, admitted in evidence, there appears an interesting article by Dr. Mary O. Amdur. She describes the experience in different places of the world with the concentration of sulfurous

---

[1] P.P.M. is equivalent to "parts per million."

anhydride gas or sulfur dioxide in the atmosphere. From the article we cite the following:

"We have more information about acute effects from studies of the Meuse Valley disaster of 1930, which was responsible for 60 deaths; the smog of 1948 in Donora, Pa., which killed 20 persons and caused symptoms of varying degrees of severity to 40 percent of the population; and the London fog of December 1952, which accounted for the death of a large number of persons. One fact is clearcut. The deaths and illness observed during these incidents were due to chemical pollutants of the atmosphere and not to other causes.

.    .    .    .    .    .    .    .

"Measurements of the concentrations of sulfur dioxide and smoke made in London during the fog and calculations made after the Meuse Valley and Donora incidents reveal that the concentration of pollutants was not excessively high. They were, of course, much higher than those normally found in the atmosphere, but they were nowhere in the range normally considered lethal or injurious. The concentrations did not even approximate the so-called maximum allowable concentrations—the levels industrial hygienists regard as safe for an exposure of 8 hours a day for workmen in industry.

"The maximum allowable concentration of sulfur dioxide is 10 p.p.m. The calculated concentration was about 8 p.p.m. for the Meuse Valley and 0.5 p.p.m. for Donora. The measured average sulfur dioxide for the peak day of the London fog was 1.3 p.p.m. This concentration is about 10 times the amount normally found in London, but on the other hand, it is still only a tenth of the maximum allowable concentration.

"How then can atmospheric pollutants produce such widespread injury and mortality at concentrations not normally considered harmful? At first glance it seems surprising that this should be so. To some it is even tempting to conclude that this pollutant or that one could not possibly have contributed to the overall picture because industrial exposures to much higher concentrations have supposedly caused no harm to workmen over a period of years.

"But are the industrial workman and the person injured during the fog really comparable? For several reasons, I feel that the answer is no.

"These maximum allowable concentrations are intended as a guide for levels of exposure of individuals healthy enough to be engaged in factory work in the first place. Persons with cardiac or respiratory pathology of any severity are not as a rule found in occupations in which respiratory irritants are encountered routinely. Hence, the MAC values are designed to protect the average and not the highly susceptible individual. It is these very persons, however, with whom we must be concerned in fog disasters."

In view of the foregoing, it is therefore clear that the error assigned was not committed.

■ 2. In *Cruz* v. *Ortiz, supra*, we held that in an action for injunction to enjoin or forbid the continuation of acts and activities causing damages, plaintiff may claim the damages that existed and were caused by such acts and activities until the moment of the hearing of the injunction petition. If he fails to claim them, the rule of splitting of causes of action would preclude him from claiming such damages in a subsequent suit.

The judgment awarded to plaintiff Tartak $10,360, the cost of installing new windows to replace the existing windows which were deteriorated by the corrosive action of the gases expelled by the chimney. Defendant alleges that plaintiff could have recovered these damages in the injunction suit referred to hereinabove. The hearing of that petition was held on November 15, 18 and 29, 1954. Pablo Tartak's testimony in that action shows that at that time the cost of changing the windows was already known and a contract had been entered into for such purpose. It is therefore evident that it was not proper to award any item for replacing the windows in this action.

■ 3. In support of its view that the item allowed for loss of rents had prescribed, defendant alleges that the complaint was amended in order to establish the claim after one year had elapsed since the two floors were vacated. In *Capella* v. *Carreras*, 57 P.R.R. 250 (1940), affirmed in

*Arcelay* v. *Sánchez,* 77 P.R.R. 782 (1955), we adopted the rule to the effect that the damages caused by a continuing nuisance may be recovered for the entire period of its maintenance.

The trial court awarded on this account the sum of $17,253. Having examined the evidence presented, the correct amount to be awarded is $14,148.41. The sixth and seventh floors were vacant from April 15, 1955 to May 22, 1956, when the complaint was amended, that is, 13 months and one week. The monthly rental for both floors was $1,166, making a total of $15,449.66.[2] From this sum it is necessary to deduct $105 monthly during three months and one week elapsed from October 14, 1955 to January 23, 1956, during which an office was occupied, totalling $341.25, and also $960 corresponding to the period from January 23, 1956 and May of that year, for a monthly rental of $240. The two figures aggregate $1,301.25 which, after being deducted from $15,449.66, net $14,148.41.

4. Let us consider the challenge of fees awarded. They are clearly unproportionate. In view of defendant's attitude and the work performed, an award of $3,500 for attorney's fees in case AP-62-25, of $2,000 in civil case 12867, and of $1,500 in civil case 12642 is reasonable.

5. In connection with the appeal taken by Tartak Bros., Inc., from that part of the judgment denying to it the right to receive compensation for the damages to the furniture, the error alleged was not committed.

■ Tartak's theory is that defendant is liable to it for the amount which it failed to receive (profits unrealized) as a result of having been compelled to sell the damaged furniture at a price lower than that at which it was regularly sold. Profits unrealized has been recognized as compensable. *Cintrón* v. *Ins. Ind. & Agr. Exp. Ass'n, Inc.,* 58 P.R.R. 820

---

[2] Defendant erroneously alleges that the total is $13,217.

(1941) ; *Avilés* v. *Sons of Rafael Toro, Ltd.*, 27 P.R.R. 616 (1919) ; *Muriente* v. *Terrasa et al.*, 22 P.R.R. 686 (1915). However, in order that they may be awarded it is necessary that the amount thereof be established with certainty and accuracy. See *Muriente* v. *Terrasa, supra.*

The evidence presented by Tartak consisted in Eduardo Tartak's testimony and the latter's answer to an interrogatory notified to him by defendant. It appears from the evidence that Tartak "estimated" the "depreciation" sustained by each piece of furniture and that he deducted such depreciation from the price at which the furniture is normally sold.

However, he did not offer evidence on the price at which the damaged furniture was sold since it was not identified. Even in the few invoices presented, Tartak stated his impossibility to assert that the furniture therein described was the damaged furniture. Nor was any evidence presented to the court on the cost of such furniture.

The basis taken by appellant is in fact very vague. Had it introduced evidence of the price at which every piece of damaged furniture was sold as well as of the price at which it is usually sold when in good condition, the court would have been in a better position to determine the damages accurately.

The error was not committed.

In view of the foregoing, the judgment rendered by the Superior Court, San Juan Part, on January 16, 1958 will be modified in the sense of reducing the indemnity awarded to Tartak Bros., Inc., to the sum of $14,148.41, and reducing the award of attorney's fees as hereinabove stated. As thus modified, the judgment will be affirmed.